# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL J. VIGNEULLE, as Personal Representative for the Estate of Andrew Michael Vigneulle, | } } } } | |
| Plaintiff, | } } | Case No.: 2:15-cv-02268-RDP |
| v. | } } | |
| TAHSIN INDUSTRIAL CORPORATION USA, | } } } | |
| Defendant. | } | |

# MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. # 35), Defendant's Motion *in Limine* to Exclude, or in the Alternative, Limit the Testimony of Plaintiff's Expert, John Nigel Ellis (Doc. # 37), Defendant's Motion *in Limine* to Exclude, or in the Alternative, Limit the Testimony of Plaintiff's Expert, Norman Wood, Jr., M.D. (Doc. # 39), Defendant's Motion to Strike the Affidavit of Expert J. Nigel Ellis (Doc. # 47), and Defendant's Motion to Strike the Affidavit of Expert Dr. Norman E. Wood, Jr. (Doc. # 49). The motions are fully briefed and under submission. (*See* Docs. # 36, 38, 40, 43-46, 48, 50-56).

This products liability case arises from a hunting accident in which Andrew ("Drew") Michael Vigneulle died. While hunting in a tree stand, Drew Vigneulle[1] wore a Tahsin Model #2013C-W harness ("2013C-W Harness"), which was manufactured by Defendant. Drew fell from the tree stand and died before rescuers could remove him from the tree. A medical

---

[1] To aid in clarity, this Memorandum Opinion will refer to Plaintiff Michael J. Vigneulle as "Plaintiff" and Andrew Michael Vigneulle as "Drew."

examiner determined that Drew died from positional asphyxia. Beyond those basic facts, much about what tragically occurred remains unclear.

## I. Motions to Exclude Plaintiff's Experts

Defendant asks the court to exclude the testimony of both of Plaintiff's experts. John Nigel Ellis is a registered professional safety engineer and currently the president of Dynamic Scientific Controls, a consulting firm that specializes in fall hazard issues. (*See* Doc. # 44-1 at 3). Ellis opines that Defendant's safety harness was defectively designed because it lacked an attached dual-footed suspension relief device, a release mechanism for loosening the chest strap, and a self-lowering device attached to the harness. (*See* Doc. # 44-2 at 7). Dr. Norman Wood, Jr., is a physician, certified tree stand safety instructor, and safety harness designer. (*See* Doc. # 43-1 at 1). Wood opines that the safety harness was defectively designed because it lacked an attached dual-footed suspension relief device or a device allowing the wearer to lower himself (or herself) to the ground. (*See id.* at 14-15). Wood also opines that the 2013C-W Harness worn by Drew constricted his chest, which decreased blood circulation to his heart, lungs, and brain and caused his death from positional asphyxia. (*See id.* at 7-8). The court addresses Defendant's arguments for excluding the expert opinions, in turn.

### A. Background Law

Although this is a diversity action governed by Alabama substantive law, the court applies federal law to decide whether an expert's testimony is admissible. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1193 (11th Cir. 2010). The admissibility of expert testimony is governed by Federal Rule of Evidence 702, along with the Supreme Court's *Daubert* decision and its progeny. Rule 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact." In *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. *Id.* at 597. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001). *See also United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Accordingly, under Rule 702, "this [c]ourt has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." *Whatley v. Merit Distribution Servs.*, 166 F. Supp. 2d 1350, 1353 (S.D. Ala. 2001).

Although the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95. *See also McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). "But conclusions and methodology are not entirely distinct from one another"; neither *Daubert*, nor Federal Rule of Evidence 702, requires a trial judge "to admit opinion

evidence that is connected to existing data only by the *ipse dixit*[2] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Eleventh Circuit applies a three-part approach to *Daubert* motions:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). The expert's proponent must prove each of these elements by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). And, while "the proponent of the testimony does not have the burden of proving that it is scientifically correct," he must establish "by a preponderance of the evidence [that] it is reliable." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). The court's analysis of a proffered expert's qualifications is "not stringent"; that is, so long as a proffered witness is "minimally qualified," a defendant's challenge to specific deficiencies in his or her experience goes "to credibility and weight, not admissibility." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)), *aff'd*, 609 F.3d 1183 (11th Cir. 2010).

To aid in determining reliability under Rule 702, courts look to non-exclusive factors set forth in *Daubert*:

---

[2] From the Latin, this phrase is translated "he himself said it." An *ipse dixit* statement is one which is unsupported and rests solely on the authority of the individual who makes it. *See United States v. Barnes*, 295 F.3d 1354, 1362 (D.C. Cir. 2002) (quoting *Black's Law Dictionary* 961 (4th ed. 1968)).

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (citing *Daubert*, 509 U.S. at 593-94). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) ("[*Daubert's*] list of factors was meant to be helpful, not definitive."). Under *Daubert*, "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendments (citations omitted). The notes to Rule 702 make clear that "[n]othing in [Rule 702] is intended to suggest that experience alone -- or experience in conjunction with other knowledge, skill, training or education -- may not provide a sufficient foundation for expert testimony." *Id.* The Rule "expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.* But, "[a]s gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

The notes to Rule 702 provide an additional list of factors that the court may use to determine the reliability of expert testimony. These factors are:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)     Whether the expert has adequately accounted for obvious alternative explanations;

(4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; [and]

(5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1386 (M.D. Ga. 2014) (paraphrasing Fed. R. Evid. 702 advisory committee's note to 2000 amendments).

The Eleventh Circuit has recognized that the relevance of evidence is judged by a liberal standard. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting *Daubert*, 509 U.S. at 587). Nevertheless, expert testimony should be excluded as irrelevant if it has no "valid scientific connection to the pertinent inquiry." *Id.* (quoting *Daubert*, 509 U.S. at 591-92). In a situation where one expert's testimony is relevant based on underlying testimony from another expert, and the other expert's testimony is excluded, the court may also exclude the testimony from the otherwise qualified expert as irrelevant. For example, in *Rink*, the Eleventh Circuit affirmed the exclusion of expert testimony from toxicologists and treating physicians as irrelevant because the district court had excluded "foundational" expert testimony from a chemical engineer that was necessary to show that the product used was defective. 400 F.3d at 1294.

Whether a *Daubert* hearing is necessary is a decision committed to the trial court's sound discretion. *Cook v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005). "*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses." *Id.* (internal quotations omitted).

**B.      Admissibility of Ellis's Expert Opinions**

Defendant challenges the proffered expert testimony of John Nigel Ellis.  After careful review, and for the reasons addressed below, the court sustains that challenge with regard to all three design opinions presented in Ellis's testimony.[3]

### 1.      Ellis is Qualified to Provide Expert Testimony About the Design of Safety Harnesses

In its motion *in limine*, Defendant argues that Ellis is unqualified to provide expert testimony about safety harnesses used in tree stands because he is not a mechanical engineer or an accident reconstructionist.  (*See* Doc. # 38 at 12-14).  The court disagrees and finds Ellis to be a qualified expert.

Plaintiff has demonstrated that Ellis is qualified to offer expert testimony about fall prevention and safety harnesses.  Ellis is a certified safety professional, a registered professional safety engineer, and a fellow and member of the American Society of Safety Engineers.  (Doc. # 44-1 at 3).  He has been the president a consulting firm that specializes in fall hazards for more than thirty years.  (*Id.* at 6).  Ellis served for a total of twenty-six years as the president and chief executive officer of a safety equipment manufacturer who produced fall protection products, including harnesses.  (*Id.*; Doc. # 44-2 at 2).  Finally, Ellis has been involved in committees of the American National Standards Institute that assess and develop industrial standards on fall arrest systems, along with a committee of the American Society for Testing and Materials that establishes standards for hunting tree stands.  (Doc. # 44-1 at 3-5).  Defendant objects to Ellis's qualifications because he is not a mechanical engineer or accident reconstructionist, but the court

---

[3] In its motions *in limine*, Defendant overreaches at times to challenge the experts' abilities to testify about issues not before the court on summary judgment.  To be clear, the court does not intend to preclude Ellis from testifying at all, as the court finds him to be a qualified expert whose methodology is, by and large, reliable.  The court expects substantial motion *in limine* practice prior to trial, which may -- among other things -- seek to clarify the issues on which the experts may testify.

finds that Ellis has substantial knowledge, experience, and training that allows him to competently testify about whether Defendant's safety harness was defectively designed.[4]  *See Bryant*, 9 F. Supp. 3d at 1388-89 (finding a mechanical engineer who had worked in safety engineering and human factors to be qualified to opine on the design of a tree stand ladder, even though the defendant argued that the engineer lacked experience with ladder stands).

      **2.    Ellis's Opinions About the Chest Straps of the 2013C-W Harness are Sufficiently Reliable, Based on the Rule 56 Record, but His Opinions about Other Features of the 2013C-W Harness are Not Sufficiently Reliable**

Defendant argues that Ellis's design opinions should be excluded because he conducted a demonstration test without using all of the components of Defendant's safety harness. (Doc. # 38 at 17). Defendant also insists that Ellis's demonstration is speculative because he did not use the suspension relief device included with the harness. (*Id.*). Moreover, Defendant claims that Ellis's identified defects are speculative because he has never consulted for a tree stand harness manufacturer, he has admitted that the harness met industry standards, he has not examined the harness used by Drew or the test site, and he has not addressed alterations made by Drew to the packaged harness. (*Id.* at 6-8). The court finds that Ellis's expert opinions are reliable in some aspects, but not others.

---

[4] The court has reviewed Defendant's cited authorities for excluding experts for lack of qualifications (*see* Doc. # 38 at 14) and finds them to be distinguishable. For example, in *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005), the Eleventh Circuit affirmed the exclusion of a proffered expert witness in chemistry whose academic work and professional experience related more to plant pathology than to chemistry. *Id.* at 1269. In contrast, Ellis has substantial experience in safety engineering and engineering fall prevention equipment. Similarly, in *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999), the Eleventh Circuit affirmed the exclusion of a law professor who the defendant had proffered to criticize handwriting analysis. *Id.* at 912. That law professor had reviewed literature on handwriting analysis for a law review article written several years before the trial, but he "had done virtually no further research or writing on the subject of the reliability of handwriting expertise" after the article had been published, and he had no other formal training or experience in handwriting analysis. *Id.* Ellis is clearly differently situated from the law professor excluded in *Paul* because of his decades of experience in safety engineering. *Cf. Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (affirming the admission of an economist's testimony about lost value damages from civil racketeering in a real estate venture where the economist had a Ph.D in economics, extensive experience as an economist, and a background in estimating damages, even though the economist had no real estate development experience).

In his affidavit, Ellis avers that he reached his conclusions after considering the following information and data: (1) his personal experience in the harness industry, (2) his inspection of an exemplar harness, (3) his personal testing of the exemplar harness, (4) his review of testimony and photographs concerning Drew's positioning at the scene, and (5) his testing of the release force of the neck gaiter.[5]  (Doc. # 44-2 at 4).  Ellis tested the exemplar harness to determine whether the chest straps could constrict a wearer's neck.  (Doc. # 36-7 at 28).  Ellis affixed the rope attached to the harness to the support of a basketball hoop.  (*Id*. at 29).  To suspend himself, he stepped off of a ladder.  (*Id*. at 40).  He tightened the shoulder straps so that they fit his body.  (*Id*. at 38).  But, he loosened the leg straps of the harness so that they were not snug against his body.  (*Id*. at 58).  Ellis has explained that he wore loose leg straps because he believed that Drew's leg straps either slipped or were attached loosely during the incident, and it "was conceivable by the manufacturer that that's how they might be worn."  (*Id*. at 35, 58).

After careful review, the court is satisfied that Ellis's testing methodology is sufficiently reliable for admitting his expert testimony regarding the chest straps.  As an initial matter, Defendant wholly fails to specify which *Daubert* factors weigh against admission of Ellis's testimony.  (*See* Doc. # 38 at 14-17) (providing a comprehensive, defense-oriented review of *Daubert* and its progeny without applying the four factors therein to Ellis's testing).  And, the Rule 56 record indicates that Ellis's experiential methodology is generally accepted within the relevant engineering community, as it is essentially similar to the methodology employed by Defendant's expert, George Saunders, Jr.  (*See* Doc. # 36-13 at 13-17) (discussing exemplar harness testing conducted by Saunders).  *See also Reid v. BMW of N. Am.*, 430 F. Supp. 2d 1365, 1370 (N.D. Ga. 2006) ("In a products liability case, a technical field like engineering often relies

_____

[5] Ellis has testified that he reviewed Wood's expert report, George Saunders's expert report, photographs and video of Saunders's testing, L.J. Smith's expert report, Dr. Steven Dunton's forensic report and deposition, and the depositions of fact witnesses.  (Doc. # 36-7 at 25-26).

on more idiosyncratic methods of design and testing. Therefore, it is more common that engineering experts state that their opinions are not based upon any scientific method but on general experience and knowledge after a review of the evidence.") (citations omitted). Although it appears that Ellis's experiential methodology is not peer reviewed and has no known error rate, *see United Fire & Cas. Co.*, 704 F.3d at 1341, these factors are not applicable to all forms of expert testing. *See Kumho Tire*, 526 U.S. at 150.

Ellis's opinion that the chest strap of the 2013C-W Harness can strangle a hunter in certain circumstances is not an unjustifiable extrapolation from an accepted premise in the case. His opinions are based on his extensive engineering background and experience, together with his personal observations of the operation of the 2013C-W Harness and the photographs showing Drew's body position while suspended from the tree. In other words, Ellis used a reliable method to work "backward" from what was known -- *i.e.*, that Mark Bray observed the harness's chest strap against Drew's neck -- to whether it could have occurred. *Cf. Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1240 (M.D. Ala. 2014) (admitting reconstruction evidence based on facts and data considered by an accident reconstructionist). Moreover, Ellis clearly understands and accounts for Defendant's alternative explanation for the neck abrasions observed by Dunton. (*See* Doc. # 44-2 at 4) (explaining that Defendant's theory that the neck gaiter strangled Drew is unsupported because he could have released the gaiter with less than 50 pounds of force). (*See also* Doc. # 36-7 at 100) (stating that the harness could not have transferred force through the gaiter to Drew's neck). Ellis has acknowledged Defendant's argument that Plaintiff misused the harness by not tightening the leg straps, but has averred that such a violation of the instructions was "conceivable" to a manufacturer. (Doc. # 36-7 at 58). Additionally, it appears that Ellis was as careful in his testing of the 2013C-W Harness as he

would be in his regular professional work. For these reasons, the court concludes that Ellis's opinions regarding the chest straps are sufficiently reliable to be evaluated by the trier of fact.

However, the court concludes that Ellis offers no reliable testing or methodology to support his opinions that the unattached suspension relief device and lack of a self-lowering device are design defects in the 2013C-W Harness. Ellis has not discussed any testing of the suspension relief device in his expert affidavit. (*See generally* Doc. # 44-2). Moreover, the following testimony from Ellis's deposition demonstrates his limited personal knowledge about suspension relief devices and that he defers to Wood's opinions on the suspension relief device provided:

> Q. Would you agree with me that if a user does have a suspension relief device, even with the one loop, when a user places their full weight on that loop and stands up, that the pressure is relieved from not only the leg that's standing in the loop, but also the other leg?
>
> A. No. We will find out from the expert in this case, Mr. Wood, but I think both legs have got to be accommodated.
>
> Q. Sir, have you ever stood in a one-looped suspension relief device while hanging from a tree stand to see if it relieves pressure from both legs?
>
> A. All I know is having left the manufacturing business in 1996, they have been adopted in both industries, construction and also hunting.
>
> Q. But would it surprise you, Dr. Ellis, if you put a suspension relief device around a tree, you're hanging from a harness, you put one foot in that loop and you stand up with that one foot, that pressure is relieved from both legs and blood begins flowing into both legs?
>
> A. I'm not a medical expert in this area. Mr. Wood, I'm sure, will opine in this area.
>
> So I would think that the majority of devices on the market are a single loop, which you get both feet into and then you can rock back and forth to get the blood moving again. That's probably the best design, if one accepts this device as a viable tool in rescue or self-rescue. . . .

Q.  So to answer my question, have you ever in your life stood in a suspension relief device with one foot stood up while hanging from a harness and see[n] if it relieves pressure from both legs?

A.  I have not done that.  I don't think I will do that.  I think you have to be able to use both feet.  You can't do that without changing your feet.  You got to turn the luger inside out to get it wide enough to get your shoe in.

Someone with a big stomach like me and can't see over his stomach or his coat to get his foot in there, so it might be extremely difficult to do that with a flexible object.  So I'm saying that's an improper design. . . .

Q.  And since you've never done it yourself, you do not know with any certainty whether standing with one foot in a suspension relief loop allows for relief in both legs and the blood to start flowing again?

A.  I would defer to a physician, M.D., Dr. Norm Wood.

(Doc. # 36-7 at 106-10).  As this testimony makes clear, Ellis conceded that he would defer to Wood's testimony about suspension trauma.  (*Id.* at 134) ("I think we talked a little bit about suspension trauma, but I'm going to be subject to Norm Wood's opinions when you depose him.").  Because his deposition testimony and lack of independent testing of the suspension relief device reveal that Ellis would merely regurgitate Wood's opinions about the deficits of the suspension relief device, Ellis's opinions about the suspension relief device are due to be excluded.  *See Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of facts, data and conclusions of other experts, such expert must make some findings and not merely regurgitate another expert's opinion.") (internal quotation marks and citations omitted).

Likewise, Ellis offers no basis for his opinion that "[w]hile hanging at a recreational height when hunting, typically under 20 feet, the safest and most effective lifeline system is a self-lowering device that attaches to the harness itself and allows a wearer to single-handedly[,] and without assistance, lower himself to the ground."  (Doc. # 44-2 at 7).  Ellis has not described

any testing of a self-lowering device for this litigation in his expert affidavit. (*See generally* Doc. # 44-2). Nor has Ellis provided literature supporting his testimony about a self-lowering device. (*See generally id.*). Again, Ellis's prior testimony indicates that his opinion about self-lowering devices is parroting Wood's opinions about the advisability of such devices:

> Q. Now, you reference a self-lowering device. In your opinion, is that a separate device that allows a user, when they fall from a tree stand that's being suspended by the safety harness, that's a separate device that allows them to lower themselves to the ground?
>
> A. It's all as one. It's Norm Wood's unit.
>
> Q. Is that currently for sale, do you know?
>
> A. I don't know. You have to ask him in his deposition.
>
> Q. So in your report when you reference a self-lowering device that's part of the safety harness, that was basically you talking to Mr. [Wood] and you talking about his product?
>
> A. I think so at this time -- or at that time.

(Doc. # 36-7 at 132-33). Ellis's opinion about self-lowering devices is due to be excluded for lack of a reliable foundation. *Cf. Eberli*, 615 F. Supp. 2d at 1364 (excluding expert testimony premised on another expert's opinion without additional findings by the proffered expert).

### 3. Ellis's Design Opinion About the Chest Strap is Not Useful in the Absence of Causation Testimony

Defendant argues that Ellis's expert testimony is irrelevant because he did not base his demonstrative experiment on the facts of the case. (Doc. # 38 at 17). Plaintiff responds that Ellis wore the 2013C-W Harness as it could have been worn by Drew on December 7, 2013. (Doc. # 44 at 13-14). Moreover, Plaintiff explains that the harness was properly fitted, and Ellis's testing results "are entirely relevant to whether it was reasonably foreseeable to the Defendant that a person wearing the Tahsin harness might choke or otherwise asphyxiate." (*Id.*

at 14).  In reply, Defendant argues that the demonstration is misleading and irrelevant because "there is no evidence in this case that the chest strap came in contact with Mr. Vigneulle's neck." (Doc. # 45 at 10-11).  Ultimately, after careful review, the court agrees with Defendant that Ellis's expert testimony about the chest strap design defect is due to be excluded because, absent testimony that the chest strap caused any harm to Drew, it is not relevant to the issues in this case.

A thorough review of Ellis's and Wood's testimony and affidavits reveals that neither proffered expert has opined that the chest strap strangled Drew or harmed him in any fashion. Ellis has averred that the chest straps on the 2013C-W Harness can strangle a hunter and that a hunter is unlikely to be able to rescue himself or herself unless a tree stand harness has either an attached dual-footed suspension relief strap, a chest strap that can be loosened, or an attached self-lowering device.  (Doc. # 44-2 at 7).  Yet, Ellis conceded during his deposition that he is not offering an opinion about causation in this case and he is not claiming that Drew's death was caused by strangulation from the chest strap.  (Doc. # 36-7 at 44-45).  Ellis expressly deferred the causation issue to other experts.  (*Id.*).  During his deposition, Wood confirmed that he does not believe Drew's death was caused by the 2013C-W Harness strangling Drew's neck.  (Doc. # 36-8 at 8).[6]  Wood does not believe that the harness's chest strap would have been able to strangle Drew, regardless of how loose the leg straps were.  (Doc. # 36-8 at 79).  Simply put, neither Ellis

---

[6] Q.  Dr. Wood, your opinion in this case is not that Mr. Vigneulle was choked or strangled by a safety harness but rather he died because of a restriction of blood flow in his chest from a safety harness, eventually causing unconsciousness and then his death?

A. Correct.

(Doc. # 36-8 at 8).

nor Wood has testified that the chest strap design, to the extent it was a defective design feature of the 2013C-W Harness, harmed Drew.[7]

In his summary judgment brief, Plaintiff argues in support of defective design and inadequate warning claims under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). (Doc. # 53 at 17-32). Causation is an essential element of an AEMLD claim. *See Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 31 (Ala. 2003) (To succeed on a claim under the AEMLD, the plaintiff must prove, among other elements, "that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer.") (internal quotation marks and citation omitted). Because Plaintiff has not proffered expert testimony that the chest straps caused harm to Drew, Ellis's expert opinion about this aspect of any alleged design defect is due to be excluded.

## C.     Admissibility of Wood's Expert Testimony

In contrast to Defendant's attack on Ellis's expert testimony, the court concludes that its attack on Wood's expert testimony is due to be denied in substantial part.

### 1.     Wood is Qualified to Testify About Safety Harness Design and Drew's Cause of Death

Wood has presented opinions to the court regarding the design of the 2013C-W Harness, the cause of Drew's death, and the warnings that accompanied the tree stand and harness. Defendant argues that Wood is not qualified to render an opinion on the cause of Drew's death because he is not a forensic pathologist, he does not conduct autopsies, he normally does not investigate causation issues, this is the first case in which he has ever provided a cause-of-death

---

[7] Mark Bray, an emergency medical technician who responded to the incident, has testified that he observed Drew slumped in his harness such that the chest strap lay at the base of his neck. (Doc. # 36-17 at 62-63). Bray did not testify, though, that the chest strap pressed against Drew's neck or strangled him in any manner. (*See id.*). Thus, Bray's observation regarding the placement of the chest strap offers no evidence that the chest strap harmed Drew.

opinion, and he has never been qualified as an expert witness. (Doc. # 40 at 6-7). Moreover, Defendant insists that Wood is not qualified to opine about the harness's design because he has never "analyzed a full body safety harness used with treestands" or "any accident[ ] involving a safety harness used with a treestand or any cases that allegedly involve suspension trauma," he lacks knowledge about the suspension relief devices used in the industry, and he is not an engineer or warnings expert. (*Id.* at 7). Plaintiff responds that Wood is qualified to render his opinions because he previously investigated incidents as a law enforcement officer, he has worked as a family practitioner and medical director for twenty years, he developed his own safety harness designs that included attached suspension relief devices, he has lectured to groups and published an article on suspension trauma, and he has been a member of the Treestand Manufacturer's Association. (Doc. # 43 at 5-8).

While it is a close call, the court concludes that Plaintiff has shown that Wood has sufficient knowledge and experience to testify about safety harness design. Wood has designed patented safety harnesses, including harnesses with self-rescue descent systems and attached suspension relief devices. (Doc. # 43-1 at 1, 18). Wood is a certified tree stand instructor and was a member of the Treestand Manufacturer's Association for two years. (*Id.* at 18). He has published an article on suspension trauma in the International Hunter Education Association Journal. (*Id.*). And, he has lectured on suspension trauma and tree stand safety at the National Academy of the Mine Safety and Health Administration, American Society of Safety Engineers, Joseph A. Holmes Safety Association, Joint Global Safety and Security Conference, and the safety day conference conducted by the Occupational Safety and Health Administration. (*Id.*). The court recognizes that Wood's law enforcement and medical education is not relevant to the harness design opinions proffered in his expert affidavit, but an expert can be qualified to testify

on the basis of experience in the absence of directly relevant education. And, in the Federal Judiciary Center's *Reference Manual on Scientific Evidence*, the authors caution judges against "drawing conclusions about an expert's qualifications based solely on titles, licenses, registration, and other such documentation." *Reference Manual on Scientific Evidence* 949 (3d ed. 2011). *See Rockhill-Anderson*, 994 F. Supp. 2d at 1235 (finding an accident reconstructionist to be qualified for expert opinion despite his lack of "qualifications" in biomechanics and kinematics). Accordingly, the court finds that Wood has substantial specialized knowledge and experience that allows him to competently testify about whether Defendant's safety harness was defectively designed. Defendant's arguments that Wood has no engineering education and no experience in such a narrowly-described subfield -- safety harnesses packaged with tree stands -- are matters for cross-examination.

Likewise, the court concludes that Wood is qualified to testify about the cause of Drew's death. Wood has been a physician for approximately twenty years and graduated with honors from the West Virginia School of Osteopathic Medicine. (Doc. # 43-1 at 1, 18). Wood worked in family practice from 1997 to 2012, after which he worked as the medical director for an outpatient clinic of a Veterans' Administration hospital. (Doc. # 36-8 at 147-49). The court finds that this specialized knowledge, experience, and training makes Wood at least minimally qualified to testify about the medical causation of Drew's death. The court has reviewed Defendant's authorities that affirmed the exclusion of experts for lack of necessary expertise. (*See* Doc. # 40 at 18-19). But none of those cases addressed the minimal qualifications necessary for a physician to testify about medical causation. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (affirming the district court's exclusion of a proffered chemistry expert on the grounds that the expert's academic and professional experience related

more to plant pathology and botany than chemistry); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (affirming the district court's exclusion of a law professor proffered to testify about handwriting analysis where the professor "had no skill, experience, training or education in the field"); *United States v. Frazier*, 387 F.3d 1244, 1263-67 & n. 16 (11th Cir. 2004) (*en banc*) (affirming the exclusion of a forensic investigator who was found to be qualified by the district court, although noting that the district court found the forensic investigator unqualified to offer medical opinions because he was not a medical doctor). Indeed, the court's independent research has found no case where a court excluded a medical doctor as *unqualified* to offer medical opinions about causation. Rather, almost all of the cases reviewed by the court in its independent research discuss whether the medical doctor's causation opinion is *reliable*.

### 2. Wood is Not Qualified to Testify About the Warnings Included With the 2013C-W Harness

In his affidavit, Wood has stated that the printed instructions and the video instructions included with the tree stand should have discussed "how being suspended in a safety harness can harm the human body, how fast suspension trauma can occur, the early symptoms to watch for, how to use a properly designed harness with the built-in safety function of a permanently attached suspension relief strap . . . [,] what must be done by the harness wearer to survive long enough for a rescue to be performed, and what to do after a person has been rescued from being suspended." (Doc. # 43-1 at 17). The court finds that Wood is not qualified to opine on the effectiveness of the warnings provided by Defendant with the tree stand and harness. Wood has admitted that he is not a warnings expert. (Doc. # 36-8 at 25). While Wood designed and wrote warnings for his own harnesses (*id.* at 29), Wood has not identified any other experience he has had with warnings. Given his very limited experience with writing warnings, the court concludes that this portion of his expert testimony would not be helpful to a jury and is due to be

excluded.[8]  *Cf. Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1347 (M.D. Ga. 2015) (excluding an expert's testimony about warnings and instructions where he was not a warnings expert, never developed or designed warnings, and had limited experience with the type of forklift involved in the accident).

### 3.    Wood's Design and Causation Opinions are Sufficiently Reliable

In its motion *in limine*, Defendant contests the reliability of Wood's expert evidence on several grounds.  First, Defendant argues that any opinions derived from Wood's personal test of the 2013C-W Harness are due to be excluded because his experiential test was not based on the facts of the case.  (Doc. # 40 at 22-23).  Second, Defendant argues that Wood made several assumptions to arrive at his expert opinion and ignored the opinions of Defendant's experts.  (*Id.* at 26).

Plaintiff responds that Wood "reviewed a vast amount of physical evidence," visited the scene of the incident, tested an exemplar harness with similar clothing, and reviewed the autopsy report.  (Doc. # 43 at 11-12).  Plaintiff explains that Wood determined the cause of Drew's death -- suspension trauma -- from the physical evidence found in the case.  (*Id.* at 12-13).  And, Wood explained why an attached double-footed suspension relief device would have prevented Drew's death.  (*Id.* at 14-15).  Plaintiff argues that Wood's design defect opinion regarding the suspension relief device is supported by "a basic knowledge of human physiology . . . along with the documented dangers of Suspension Trauma."  (*Id.* at 15).

---

[8]  Even if the court found Wood qualified to testify about the warnings included with the harness (and, to be clear, it does not), Wood's opinions about the deficient warnings are also due to be excluded as unreliable.  Wood has not identified the process he used to examine or assess the efficacy of the warnings.  Nothing in the record indicates that Wood reviewed empirical research on how consumers process warnings, compared the warnings included with Drew's harness to other warnings, or compared the warnings to industry standards.  *See Fisher v. Bumbo Int'l Trust*, 2014 WL 12026083, at *6 (S.D. Fla. Aug. 20, 2014) (admitting expert testimony about defective warnings where the expert reviewed empirical research on warnings, compared the warnings on a car seat to those discussed in the research, and compared the warnings to industry standards).  Because Wood's expert testimony about warnings is due to be excluded, the court has not considered paragraph 46 of his affidavit.  (Doc. # 43-1 at 9).

The court divides its analysis of the reliability of Wood's expert testimony into two subparts: (1) whether his design defect opinions are reliable, and (2) whether his causation opinions are reliable. The court answers each question in the affirmative

### a.   Wood's Design Opinion About the Suspension Relief Device is Reliable

In his affidavit, Wood explains that he tested the 2013C-W Harness by donning the harness in the manner that Drew wore it, donning a similar hunting coat over the harness, and suspending himself "without any forceful drop in a safe place where [he] could straighten [his] legs to stand back up and relive the harness pressure on [his] body." (Doc. # 43-1 at 8). He observed that he suffered neck pressure that was alleviated by unzipping the coat, his head and neck were forced up by the coat's collar, and the coat held part of his body weight when the coat interacted with the harness. (*See id.*). During his deposition, Wood explained that he had tested single-footed suspension relief devices before and found them inadequate. (Doc. # 36-8 at 55). Plaintiff argues in a brief that Wood also relied on his experience, training, and specialized knowledge, his review of physical evidence, the autopsy report, and the depositions, and his personal interviews of Plaintiff and Mark Bray. (Doc. # 43 at 11-12).

After careful review, the court concludes that Wood's opinion on the design defect of an unattached single-footed suspension relief device is sufficiently reliable under *Daubert*. Wood's design defect opinion is based on more than his mere speculation and conjecture, as he also relied on specialized experience and knowledge, his review of physical evidence, and his experience with single-footed suspension relief devices. (*See* Doc. # 36-8 at 55-59) (discussing Wood's personal experience with single-footed suspension relief devices). *Cf. Reid*, 430 F. Supp. 2d at 1370 (explaining that product defect opinions in products liability cases often depend on experience and a review of the evidence in the case, as opposed to reproducible scientific

tests).  Significantly, in addition to his harness design experience, Wood possesses specialized medical knowledge regarding suspension trauma that informs his opinion about what features are necessary for a suspension relief device.  (*See* Doc. # 36-8 at 55-59).  Defendant's arguments that the design defect opinion should be excluded because it is unreliable are off the mark.  Properly understood, the arguments go more towards the weight that should be granted to the opinion, not the reliability of the process Wood used to arrive at the opinion.[9]  Accordingly, Wood's design defect opinion concerning the single-footed suspension relief device is not due to be excluded on reliability grounds.

### b.     Wood's Causation Opinion is Reliable

In his affidavit, Wood explains that Drew's 2013C-W Harness placed a significant amount of pressure on his upper body once he loosened and moved the leg straps.  (Doc. # 43-1 at 7-8).  Wood has averred that the chest pressure could have caused the petechiae observed on Drew's face during his autopsy.  (*Id.* at 7).  During his deposition, Wood explained why the neck bruising observed during the autopsy likely was caused by Drew's coat collar, rather than his neck gaiter.  (Doc. # 36-8 at 72-73).  He testified that it was unlikely for Drew to wear the gaiter in such a fashion that it would be pulled by the harness's tether.  (*Id.* at 143-44).

Plaintiff argues that Wood's causation opinion is supported by the physical evidence.  (Doc. # 43 at 12).  Notably, Plaintiff does not argue that Wood used differential etiology to determine the cause of Drew's death (*see* Doc. # 43 at 12-15), and Wood's affidavit contains no

---

[9]  To some degree, the court understands Defendant's argument that Wood's experiential testing is unreliable because he did not record it with photographs or a video recording.  (*See* Doc. # 40 at 7).  Unlike the other experiential tests in the Rule 56 record, the court doubts that Wood's testing can be replicated or critiqued by other experts because he made no contemporaneous recording of it.  That being said, the court declines to exclude Wood's design defect opinion on this basis because it is clear that Plaintiff relies on grounds besides Wood's testing of the exemplar 2013C-W Harness to show the reliability of Wood's expert opinion.

opinion based on differential etiology (*see* Doc. # 43-1).[10]  Rather, Wood explains how the evidence from the scene (*e.g.*, the failure of the tether's tear-away sections to engage, the position of Drew's mittens, the position of the leg straps, and Bray's observations at the scene) and Drew's observed conditions, along with his personal testing of the harness, support the conclusion that Drew died from suspension trauma.[11]  (*See id.* at 4-8).  Defendant contends that Wood assumed several facts necessary for his opinion, but the court is convinced that Wood's opinion is based on observations from the evidence at the scene.  For example, Defendant contends that the leg straps could have been loose before Drew fell from the tree stand (Doc. # 40 at 11), but Wood clearly explained during in deposition -- and in his affidavit -- that the straps would have moved to Drew's groin area when the harness stopped his fall.  (*See* Doc. # 36-8 at 75).  Defendant also contends that Wood failed to address how the harness would have worked if Drew had followed the provided directions, but this is a topic more appropriate for cross-examination.

### D.     Conclusion

For the reasons explained above, Defendant's motion to exclude Ellis's testimony (Doc. # 37) is due to be granted because no expert evidence indicates that the harness's chest strap -- even if defectively designed -- strangled Drew in the present incident.  Defendant's motion to exclude Wood's testimony (Doc. # 39) is due to be denied with regard to his design defect opinion and his causation opinion.  But, it is due to be granted with regard to his defective

---

[10]  Differential etiology -- sometimes referred to as differential diagnosis in Eleventh Circuit case law -- is "a process of compiling, or ruling in, a comprehensive list of possible causes that are generally capable of causing the illness or disease at issue, and then systematically and scientifically ruling out specific causes until a final, suspected cause remains."  *Kilpatrick*, 613 F.3d at 1342.

[11]  Wood's review of extensive evidence from the scene belies any argument that he based his opinions "entirely upon a pure visual examination of the product and improper demonstration without any testing or real-life application of the alleged alternative design and cause of death."  (Doc. # 40 at 24).

warning opinion because Wood is not qualified to testify about the defectiveness of the warnings.

## II.    Motions to Strike Expert Affidavits

Defendant asks the court to strike certain portions of Ellis's expert affidavit (Doc. # 44-2) and Wood's expert affidavit (Doc. # 43-1) because it insists that both affidavits contain "new opinions and assertions" that were not disclosed to Defendant in a timely manner. (*See generally* Docs. # 47, 49). Plaintiff responds that the affidavits appropriately elaborate on certain matters and include allowable rebuttal opinions. (*See, e.g.*, Doc. # 51 at 6-7).

The Federal Rules of Civil Procedure require retained experts to produce a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness," among other information. Fed. R. Civ. P. 26(a)(2)(B). When the court sets an expert disclosure deadline in a scheduling order, as the court did in this case, the expert's written report must be submitted within that period. Fed. R. Civ. P. 26(a)(2)(D). In this case, after a few extensions, the court ordered Plaintiff to submit retained expert reports by March 24, 2017. (Doc. # 26). Ultimately, after another extension, discovery closed on July 28, 2017. (Doc. # 30). Expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party" must be disclosed "within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The burden rests on the party who failed to disclose expert testimony to

show that the non-disclosure was substantially justified or harmless. *In re Trasylol Prods. Liability Litig.*, 2012 WL 12897158, at *3 (S.D. Fla. July 9, 2012).

Expert reports must "convey the substance of the expert's opinion," but they do not need to replicate every piece of testimony the expert could offer at trial. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010). *See also Gay v. Stonebridge Life Ins. Co.*, 711 F. Supp. 2d 165, 167 (D. Mass. 2010), *aff'd*, 660 F.3d 58 (1st Cir. 2011); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 652 (D. Kan. 2003). The Federal Rules allow an expert to "supplement, elaborate upon, and explain" the opinions in a written report through later testimony. *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (internal modification omitted). The court has reviewed the "new opinions and assertions" highlighted by Defendant in its motions. (*See* Docs. # 47 at 3-5; 49 at 3-8). By and large, the issues identified by Defendant are elaborations of the matters presented in the experts' written reports.[12] Other objections concern matters not discussed in the initial written reports, but discussed at length during the experts' depositions. The court declines to exclude affidavit testimony from the Rule 56 record where the expert fully disclosed his opinion to Defendant during his deposition.[13] *See In re Stand 'N Seal Prods. Liability Litig.*, 623 F. Supp. 2d 1355, 1363-64 (N.D. Ga. 2009)

---

[12] Some of the additions to the affidavits are harmless. For example, Wood has mentioned in his affidavit that Bray had not seen the tether threaded through the gaiter when he observed Drew's body. (Doc. # 43-1 at 7). This recollection is an addition to his expert report, but the court finds it to be harmless because Wood disclosed it during his deposition. (Doc. # 36-8 at 144). Similarly, Wood has stated in his affidavit that a single-footed suspension relief device is ineffective because it does not allow for sufficient blood circulation. (Doc. # 43-1 at 10). To the extent this is an opinion that cannot be inferred from Wood's March 2017 written report, any late disclosure is harmless because Wood discussed the circulation problem at length during his deposition and faced strong cross-examination on the question. (*See, e.g.*, Doc. # 36-8 at 54-60).

[13] For example, Wood disputed Defendant's position that Drew placed the tree strap at shoulder level during the deposition. (Doc. # 36-8 at 40-45). He explained that another photo showed a portion of the tree strap well above the tree stand. (*Id.* at 41). Therefore, the court declines to strike Wood's additional averments on that issue in paragraphs 48, 60, 61, 62, 63, and 64 of his affidavit. Similarly, the court declines to strike Wood's rebuttal testimony regarding why Drew was not strangled by the neck gaiter in paragraph 58 of his affidavit, as that topic was extensively discussed during his deposition. (*Id.* at 72-73, 143-45). And, the court declines to strike Wood's affidavit testimony about suspension trauma, which he described in detail during the deposition. (*Id.* at 55-58).

(declining to exclude an expert's testimony about how many seconds a patient needed to be exposed to a product to cause injury where he disclosed that information during a deposition). Nevertheless, the court finds one paragraph of Ellis's affidavit and one phrase of Wood's affidavit are due to be stricken.

First, paragraph 13 of Ellis's affidavit (Doc. # 44-2 at 4) is due to be stricken because it discusses a test of a neck gaiter not disclosed in Ellis's Rule 26 report or any supplement of that report. (*See generally* Docs. # 51-2 at 2-4; 51-3 at 3-8). Ellis's report states that he inspected and tested an exemplar 2013C-W Harness, but it does not describe any test of a neck gaiter. It appears that Plaintiff disclosed a photograph to Defendant of that test (*see* Doc. # 36-7 at 17-18) and Ellis described his testing of the gaiter during the deposition (*see id.* at 96-99). After Ellis described the test, Plaintiff's counsel mentioned on the record that the test was "not part of [Ellis's] original asserted opinion" and that Plaintiff reserved the right to submit rebuttal evidence. (*Id.* at 98-99). But, Plaintiff has not included a written report by Ellis of such rebuttal expert evidence, nor has Plaintiff shown that Ellis wrote such a report within thirty days of receiving Defendant's expert reports. Fed. R. Civ. P. 26(a)(2)(D)(ii). Because paragraph 13 of Ellis's affidavit discusses a test that was not discussed in Ellis's original expert report, and no supplemental written report or rebuttal report was submitted to Defendant discussing the protocol for that test (despite counsel's admission that the test at issue was not disclosed in Ellis's initial report), that paragraph is due to be excluded from the Rule 56 record.[14]

Second, paragraph 78 of Wood's affidavit (Doc. # 43-1 at 15) is due to be stricken to the extent that it identifies the lack of a self-lowering device as a design defect. Wood did not discuss the lack of a self-lowering device as a defect in his written report. (*See* Doc. # 52-2 at

---

[14] This court is not foreclosing the possibility of admitting Ellis's testimony about his tests on the gaiter at trial. At this stage of the action, though, the court finds it improper to admit Ellis's expert testimony about the gaiter when Plaintiff failed to produce any written report on the testing to Defendant before the close of discovery.

15) (discussing the lack of an attached suspension relief strap and the lack of adequate warnings for suspension trauma). Nor did Wood discuss the lack of a self-lowering device or the advantages offered by such a device during his deposition. Therefore, Wood's opinion that the lack of a self-lowering device on the 2013C-W Harness constitutes a design defect is due to be excluded from the Rule 56 record.

## III. Factual Background Regarding Defendant's Motion for Summary Judgment

Defendant has also moved for summary judgment. (Doc. # 35). The facts set out in this portion of the court's opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In December 2013, Drew purchased an unopened tree stand that was packaged with, among other items, Defendant's 2013C-W Harness. (*See* Docs. # 36-2 at 6; 36-10 at 40-41, 47; 53-1 at 52-53). The 2013C-W Harness is attached to a tree by means of a tether connected to the harness and a tree strap connected to the tether and secured to the tree. (*See* Doc. # 36-3 at 15). The harness was packaged with a suspension relief device that was not attached to the harness. (*See id.* at 16). The packaged suspension relief device was designed to wrap around a tree and allow a suspended harness wearer to place one foot inside. (*Id.*). The following "Full Body Harness Safety Warnings" were included with the 2013C-W Harness:

> The length of the harness **MUST** be minimized at all times. It should be adjusted so that it is above the head with no slack while the hunter is in the sitting position and you should have the minimum amount of slack while climbing. . . .

A suspension relief device **MUST** be on your person and readily accessible while using a harness. These devices will allow the user to relieve the load on the lower extremities if suspended in a harness and help maintain circulation in the legs, mitigate suspension trauma (blood pooling) or allow descent to the ground. Be sure to follow the manufacturers' directions on the safe use of any suspension relief device.

Several optional products/systems are available that offer self-recovery or self extraction from a fall when suspended in a harness. Some systems automatically descend the user, while others allow user control. One of these products/systems can be considered for use as an additional safety precaution against prolonged suspension and suspension trauma. Be sure to follow the manufacturer's directions on safe ue [sic] of these products/systems.

(*Id*. at 13). The "Treestand Safety Warnings" contained certain warnings about the harness as well:

**ALWAYS** wear a Fall Arrest System (FAS) (Harness) consisting of a full body safety harness with lineman's belt after leaving the ground. A TMA Certified Full Body Harness with lineman's belt must always be connected to yourself and the tree during ascending, hunting and descending. The use of a lineman's belt is **REQUIRED AT ALL TIMES** during ascending, hunting and descending the tree stand. When using a lineman's belt to ascend the tree, the full body harness **MUST** be attached to the tree before stepping onto the tree stand. The length of the harness tether strap must be minimized at all times. It should be adjusted so that it is above the head with no slack in the sitting position and you should have the minimum amount of slack possible when climbing. You **MUST** stay connected at all times after leaving the ground while using climbing aids, hang-one and climbing tree stands.

(*Id*. at 3). It cannot be established from the Rule 56 record whether Drew reviewed the warnings before using the 2013C-W Harness and associated tree stand.

When wearing a full body harness, the user must properly adjust the leg straps so that they are secure against the groin and adjust the chest straps to fit his or her upper body. (Doc. # 36-7 at 7-9). The user also should minimize the amount of slack in the tether and attach the tree strap at a height that minimizes the potential fall distance. (*Id*. at 9-10).

On December 7, 2013, Drew started hunting on his family's property around 1:00 p.m. to 2:00 p.m. (Doc. # 36-10 at 72-73). Drew wore a 2013C-W Harness, but he used a tree strap

manufactured by API Outdoors. (*See* Doc. # 36-13 at 9, 12). Drew filmed a video from the tree

stand with his phone at approximately 3:02 p.m. (Doc. # 36-10 at 82-84). Plaintiff, Drew's

father, began searching for him at approximately 4:00 p.m. because it was dark outside. (*Id.* at

85-86). Plaintiff observed Drew hanging from the tree and suspended by his harness. (*Id.* at 92).

He found Drew's gun and cell phone on the ground. (*Id.*). From the Rule 56 evidence, it cannot

be determined how or why Drew fell from the tree stand. (Docs. # 36 at 11; 53 at 8).

Mark Bray, an emergency medical technician who volunteered for Southeast Shelby

EMS, responded to the scene alongside a paramedic, another emergency medical technician, and

personnel from the Wilsonville fire department. (Doc. # 36-17 at 21-22, 26, 35-39). Bray

observed Drew suspended on the opposite side of the tree from the tree stand. (*Id.* at 46). He

has recalled that Drew's head was approximately at the same level as the foot platform of the

stand. (*Id.* at 46-47). Bray saw Drew "in a sitting position" inside the harness with his leg straps

around his thighs. (*Id.* at 60-61). And, according to Bray, the harness's chest strap rested on the

base of Drew's neck. (*Id.* at 62). Bray cut the harness's tether from Drew's body so that he

could be lowered to the ground. (*Id.* at 69). Dr. Steven Dunton, a medical examiner, determined

that Drew died from positional asphyxia. (Doc. # 36-14 at 65).

## IV.    Standard of Review for Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment always bears the initial responsibility of informing the

court of the basis for its motion and identifying those portions of the pleadings or filings which it

believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V.     Analysis of Defendant's Motion for Summary Judgment

After careful review of Defendant's arguments for summary judgment, the court concludes that Defendant is due to be granted summary judgment on Plaintiff's failure to warn and negligence claims, but is due to be denied summary judgment on his design defect claim.

### A.     Plaintiff Has Presented Substantial Evidence that the Harness was Unreasonably Dangerous

Defendant first argues that Plaintiff's design defect claim under the AEMLD fails because he has not demonstrated that the 2013C-W Harness was unreasonably dangerous. (Doc. # 36 at 20-21). In support, Defendant observes that the harness was certified by an independent testing laboratory, it met the applicable industry standards, it prevented Drew from hitting the

ground after he fell from the tree stand, and the suspension relief device would have relieved any pressure in Drew's legs if he had utilized it. (*See id.*). Plaintiff responds that Wood's testimony establishes an unreasonably dangerous harness that lacked an attached, double-footed suspension relief device. (Doc. # 53 at 19-20). The court finds sufficient evidence in the Rule 56 record to allow the trier of fact to find that the 2013C-W Harness was unreasonably dangerous as sold.

"To establish a prima facie case under the AEMLD, Plaintiff must show: (1) that [Defendant] manufactured, designed or sold a defective, unreasonably dangerous product; (2) that the product reached the consumer in substantially the same condition in which it was sold; and (3) that the product injured the consumer when it was put to its intended use." *Browder v. Gen. Motors Corp.*, 5 F. Supp. 2d 1267, 1280 (M.D. Ala. 1998) (citing *Beam v. Tramco, Inc.*, 655 So. 2d 979, 981 (Ala. 1995)). "[A] defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the ordinary consumer." *Beam*, 655 So. 2d at 981. Plaintiff must affirmatively show that the product was defective, and "the failure of a product does not presuppose the existence of a defect." *Townsend v. Gen. Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994). To survive summary judgment, a plaintiff must present "substantial evidence" of a defect under the AEMLD. *Id.* at 418.

Here, the court is convinced that Wood's testimony provides substantial evidence of a design defect in the 2013C-W Harness that rendered it unreasonably dangerous. Wood has testified that the lack of an attached, dual-footed suspension relief device rendered the harness unsafe. (Doc. # 43-1 at 17). As explained above, the court finds Wood's testimony expert testimony is admissible under Rule 702. Defendant argues that the 2013C-W Harness met industry standards, but an officer for the Treestand Manufacturer's Association has testified that

the standards address the ability of the harness to withstand the forces placed on it during a fall, not the ability for a wearer to survive extended suspension in the harness. (*See* Doc. # 53-3 at 31-32). Defendant offers no authority to support its argument that compliance with industry standards is sufficient proof that its product was not unreasonably dangerous, and the court's independent research has found no such binding authority. (*See* Doc. # 36 at 20-21). Defendant also argues that its experts performed testing which demonstrated that the harness functioned as intended. (*Id.* at 21). But, George Saunders, Defendant's engineering expert, did not test whether an individual could withstand suspension for any significant period of time by using the one-footed suspension relief device.[15] (*See* Doc. # 36-13 at 14-15) (explaining that the test subject could retrieve the device while suspended, connect it to a tree, relieve pressure in both feet by stepping into it, and switch feet, but not discussing the length of time that the test subject used the suspension relief device). The court concludes that Wood's expert testimony is sufficient to create a jury issue regarding whether the 2013C-W Harness was unreasonably dangerous as designed.

Defendant cites *Browder* and *McPhail v. Mitsubishi Motor Manufacturing of America, Inc.*, 80 F. Supp. 2d 1309 (S.D. Ala. 1997), in support of this argument for summary judgment, but both cases are distinguishable. In *Browder*, the court granted the automobile manufacturer summary judgment on the plaintiff's design defect claims because the plaintiff failed to provide substantial evidence for a predicate fact necessary to advance those claims and because the plaintiff failed to show that the vehicle was substantially unaltered. 5 F. Supp. 2d at 1283-84 (granting summary judgment on certain claims because the plaintiff failed to show that the vehicle's seat back was reclined at the time of an accident). While the *Browder* opinion

---

[15] Indeed, Saunders testified during his deposition that the manufacturer instructed users to minimize the slack in the harness and to have an escape plan because the suspension strap was not intended to be used for a long period of time. (Doc. # 53-10 at 95-96).

discussed the legal rules regarding an unreasonably dangerous product, it relied on other grounds to decide the design defect claims presented. In *McPhail*, the court granted an automobile manufacturer summary judgment on the sole design defect claim[16] because the plaintiff failed to present Rule 56 evidence of a practical and safer alternative design for the suspension part that broke, *see McPhail*, 80 F. Supp. 2d at 1315-16, something this court finds (below) Plaintiff has done here. That ground for dismissal is distinct from the dangerousness ground presented in Section III.A.1 of Defendant's motion for summary judgment, and it will be discussed below.

## B. Plaintiff Has Presented Substantial Evidence of a Practical and Safer Alternative Design

Second, Defendant argues that it is entitled to summary judgment because Plaintiff has offered insufficient evidence of an alternative design. (Doc. # 36 at 21-24). Defendant reiterates that its harness complied with industry standards, and it argues that Plaintiff's experts did not test the alternative designs. (*Id.* at 22). In response, Plaintiff argues that Wood designed, marketed, and sold safety harnesses with attached double-footed suspension relief devices, and that those harnesses were tested before sale. (Doc. # 53 at 22). Moreover, Plaintiff notes that the proposed alternative design would be equivalent in cost to including an unattached, single-footed suspension relief device. (*Id.* at 22-23). After careful review, the court finds that the practicability and safety of Wood's alternative design is an issue for the jury to decide.

Under the AEMLD, to show that a product is defective, a plaintiff must show "a safer, practical, alternative design was available to the manufacturer at the time it manufactured the product." *Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (internal quotation marks and alterations omitted). A plaintiff establishes an alternative design by showing that: (1) "[t]he plaintiff's injuries would have been eliminated or in some way reduced by use of the

---

[16] The *Browder* court construed the other defect claims raised in the case as manufacturing defect claims. *See* 80 F. Supp. 2d at 1314-18 & n. 5.

alternative design"; and (2) "the utility of the alternative design outweighed the utility of the design actually used." *Id.* (internal quotation marks and citations omitted). Factors to be considered in determining the relative utility of the product's actual design and the proposed alternative design include "the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect." *Id.* "[T]he reasonableness of an alternative design is generally a question of fact <u>for the jury</u>." *Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 205 (Ala. 2016) (emphasis in original) (citation omitted).

Here, Plaintiff has presented substantial evidence of a safer and practical alternative design. Wood has testified that he marketed and sold full body safety harnesses with the suspension relief straps in 2008 and 2009. (Doc. # 43-1 at 14). Wood has explained that he extensively tested the harnesses before placing them on the market. (*Id.*). Wood describes in his affidavit that a permanently attached suspension relief strap would have decreased the risk of death from suspension trauma. (*Id.*). And, one of Defendant's expert witnesses has conceded that an attached suspension relief device would probably have been "equivalent in cost" to the unattached suspension relief strap provided. (Doc. # 53-10 at 56-57). To be sure, Defendant's expert has identified design advantages of the single-footed device included with the 2013C-W Harness, but these potential advantages are not enough to foreclose the factual issue presented by Wood's admissible testimony.[17]

---

[17] Defendant's design expert has testified about one disadvantage of the attached suspension relief device and some advantages for an unattached device:

> The two-footed device that is interconnected to the harness; you're effectively always working against yourself. If you've properly put the harness on and now you put a strap underneath your feet, you're trying to stand in those. You're pulling the shoulder straps harder down into your shoulders. You're always going to be working against that thing that you're wearing. Whereas

### C. Plaintiff Has Presented Sufficient Evidence that the Design Defect Proximately Caused Drew's Death

Third, Defendant argues that Plaintiff cannot show that a defect in the harness proximately caused Drew's death. (Doc. # 36 at 25). Rather, Defendant insists that Drew's misuse of the harness -- specifically, his use of a different tree strap, his failure to use the suspension relief device, and his failure to properly tighten the leg straps of the harness -- proximately caused his death. (*Id.* at 25-26). Moreover, Defendant claims that the medical evidence points to Drew dying of neck strangulation and that Drew's neck gaiter caused the strangulation. (*Id.* at 27-28). Plaintiff responds that material issues of fact remain regarding the product misuse defense because: (1) Wood and Ellis have testified that use of an alternate tree strap can be appropriate; (2) it is foreseeable to a harness manufacturer like Defendant that a hunter will interchange parts; (3) Bray has recalled cutting the strap at a level above Drew's head; and (4) Bray does not recall observing Drew's neck gaiter threaded through his gaiter. (Doc. # 53 at 24-27). Alternatively, Plaintiff claims that the misuse was foreseeable to Defendant "it is known that users and hunters do not read instructions and warnings." (*Id.* at 27-29).

Under the AEMLD, a plaintiff has the burden to prove that the product proximately caused the plaintiff's harm.[18] *Clarke Indus., Inc. v. Home Indem. Co.*, 591 So. 2d 458, 461 (Ala.

---

the device that is not connected integral to the harness but is connected to the tree and uses the tree as its anchor, that allows you to raise yourself up independent of the harness, relieve all stress; you're not working against the harness.

It also has the added benefit that you can actually climb down a tree or potentially climb up a tree with that device because you have an anchor point that is the tether and an anchor point that is the suspension relief device. And you can alternate them up or alternate them down to change your elevation.

(Doc. # 53-10 at 52). These are matters for a jury to consider.

[18] In his opposition brief, Plaintiff explains that "lack of causal relation" is an affirmative defense under the AEMLD. (Doc. # 53 at 24). That defense, though, concerns the causal relationship between a defendant's conduct

1991). "The cornerstone of proximate cause is foreseeability." *Morguson v. 3M Co.*, 857 So. 2d 796, 800 (Ala. 2003). "[I]t is well established that the question of proximate causation is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence." *Lemond Constr. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995). A plaintiff does not present sufficient evidence of proximate cause to create a jury issue, though, if the evidence before the court only supports speculation, conjecture, or a guess as the cause of the incident. *Wilbanks v. United Refractories, Inc.*, 112 So. 3d 472, 474 (Ala. 2012) (quoting *State Farm Fire & Cas. Co. v. Shady Grove Baptist Church*, 838 So. 2d 1039, 1041 (Ala. 2002)).

Here, Wood's testimony offers substantial evidence that suspension trauma, not neck strangulation, proximately caused Drew's death. Wood has explained how positional asphyxia could have been caused by suspension trauma. (*See* Doc. # 43-1 at 8). And, Wood has testified about how an attached suspension relief device could have allowed Drew to survive longer before succumbing to suspension trauma, if that condition was the cause of his asphyxia. (Doc. # 36-8 at 92-93). Defendant insists that Drew easily would have been able to climb back onto the tree stand if he had followed all of the provided instructions and had used the tree strap included with the harness. Ultimately, though, the court is convinced by the testimony of Wood and John Louk that a reasonable jury could find that a harness or tree stand manufacturer reasonably foresees that hunters will use some substitute parts. (*See* Docs. # 36-8 at 104; 53-3 at 77-78). Defendant also argues that Drew died after being strangled by his neck gaiter. But, Bray's eyewitness testimony raises doubts about that theory, as he has recounted that Drew's gaiter was not threaded through the harness. (Doc. # 53-12 at 2). Accordingly, Plaintiff has

---

and the defective product, not the causal relationship between the defective product and the harm the plaintiff suffered. *See Dennis v. Am. Honda Motor Co.*, 585 So. 2d 1336, 1339 (Ala. 1991) (quoting *Atkins v. Am. Motors Corp.*, 335 So. 2d 134, 143 (Ala. 1976)).

presented enough evidence for a reasonable jury to find that the identified design defect was the proximate cause of Drew's death, if all reasonable inferences are made in Plaintiff's favor.

### D.    Defendant is Not Entitled to Summary Judgment on a Product Misuse Defense or a Contributory Negligence Defense

Defendant argues that Plaintiff's AEMLD claim is barred by Drew's contributory negligence because Drew failed to follow several warnings and instructions. (Doc. # 36 at 28-29). Defendant also claims that Drew consciously decided to not bring the suspension relief device with him to the site of the incident. (*Id.* at 29). Finally, Defendant argues that the AEMLD claim is barred by Drew's misuse of the harness because the misuse proximately caused the incident. (*Id.* at 29-30). Neither of these affirmative defenses justifies summary judgment.

Contributory negligence and misuse are both affirmative defenses to an AEMLD claim. *Carruth v. Pittway Corp.*, 643 So. 2d 1340, 1347 (Ala. 1994); *Dennis v. Am. Honda Motor Co.*, 585 So. 2d 1336, 1339 (Ala. 1991). "To establish contributory negligence as a matter of law, a defendant seeking a summary judgment must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred." *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 860 (Ala. 2002). The Alabama Supreme Court has expressed that its standard for granting summary judgment on contributory negligence grounds is distinct from -- and stricter than -- the standard given to a jury at trial. *Id.* at 861. To show misuse, a defendant "must establish that the plaintiff used the product in some manner different from that intended by the manufacturer." *Halsey v. A.B. Chance Co.*, 695 So. 2d 607, 609 (Ala. 1997) (quoting *Sears, Roebuck & Co. v. Harris*, 630 So. 2d 1018, 1028 (Ala. 1993)). A defendant also must show that the misuse was not reasonably foreseeable. *Id.* (quoting *Sears*, 630 So. 2d at 1028). Normally, a misuse defense presents a factual issue for a jury to decide. *Id.* (quoting *Sears*, 630 So. 2d at 1028). For example, in

*Halsey*, the Alabama Supreme Court reversed a summary judgment granted to a defendant on an AEMLD claim where an expert witness testified that the decedent's product misuse was foreseeable. *Id.*

Here, Defendant is not entitled to summary judgment on its contributory negligence defense because it cannot show that Drew consciously appreciated the danger when his fall occurred. *See Hannah*, 840 So. 2d at 860. While Defendant argues that Drew consciously decided to not bring a suspension relief device with him, it cites no Rule 56 evidence to support that assertion. (Doc. # 36 at 29). Of course, Defendant might be able to prove Drew's contributory negligence at trial, but the Rule 56 record does not support a finding of contributory negligence as a matter of law. Likewise, Defendant is not entitled to summary judgment on the basis that Drew misused the product. There is a substantial debate between the parties' expert witnesses about whether Drew misused the harness by utilizing a different tree strap and whether such a substitution was foreseeable to Defendant. Wood has testified that Drew's use of the harness was not improper. (Doc. # 43-1 at 9). *See also Halsey*, 695 So. 2d at 609. In light of the competing admissible Rule 56 evidence on this issue, this is a question for the jury. Defendant is not entitled to summary judgment based on any purported misuse of the 2013C-W Harness.

### E.    Defendant is Entitled to Summary Judgment on the Failure to Warn Claim

Defendant contends that it is entitled to summary judgment on Plaintiff's failure to warn claim because it provided adequate warnings, Drew improperly adjusted the product on the date of the incident, and Plaintiff's experts have not testified that the warnings were the proximate cause of Drew's death. (Doc. # 36 at 31). Plaintiff responds that Wood's testimony challenges the adequacy of the warnings included with the 2013C-W Harness. (Doc. # 53 at 31-32). As explained above, Wood is not an expert qualified to testify about the sufficiency of the warnings

included with the 2013C-W Harness. Therefore, Plaintiff lacks admissible Rule 56 evidence that the warnings were inadequate, and Defendant is entitled to summary judgment on this AEMLD claim.

## VI. Conclusion

For the reasons explained above, Defendant's Motion *in Limine* regarding Ellis's testimony (Doc. # 37) is due to be granted with regard to the design defect opinions he has proffered, Defendant's Motion *in Limine* regarding Wood's testimony (Doc. # 39) is due to be granted in part and denied in part, Defendant's Motion to Strike Ellis's affidavit (Doc. # 47) is due to be granted in part and denied in part, Defendant's Motion to Strike Wood's affidavit (Doc. # 49) is due to be granted in part and denied in part, and Defendant's Motion for Summary Judgment (Doc. # 35) is due to be granted in part and denied in part. Specifically, Defendant's motion for summary judgment is due to be granted with regard to Plaintiff's failure to warn and negligence claims[19] (Counts II and III of the Amended Complaint), but it is due to be denied with regard to Plaintiff's design defect claim in Count I of the Amended Complaint. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this March 27, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[19] Plaintiff has not argued in support of maintaining a separate negligence claim in his opposition brief. (*See* Doc. # 53 at 17-32). Therefore, the court determines that any argument for such a negligence claim has been abandoned.